Filed 8/18/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| GEORGEANNE G., Petitioner, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES et al., Real Parties in Interest. | B301629 (Los Angeles County Super. Ct. No. 17CCJP00920A) |

ORIGINAL PROCEEDINGS. Nichelle L. Blackwell, Juvenile Court Referee. Petition granted.

Keiter Appellate Law and Mitchell Keiter for Petitioner.

No appearance by Respondent.

Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel, Jessica S. Mitchell, Deputy County Counsel, for Real Party in Interest.

Children's Law Center of Los Angeles-1 and Margaret K. Lee for Lucas H., minor.

_____

Georgeanne G., the mother of four-year-old Lucas H., seeks extraordinary writ relief (Welf. & Inst. Code, § 366.26, subd. (*l*);[1] Cal. Rules of Court, rule 8.452) from the juvenile court's order at the 18-month permanency review hearing (§ 366.22) terminating her reunification services and setting a hearing pursuant to section 366.26 to consider implementation of a permanent plan of adoption for her son. Georgeanne argues her purported lack of insight into the problem that led to Lucas's removal from her custody is not properly considered in assessing whether his return to her home would create a substantial risk of detriment to the child's safety, protection or physical or emotional well-being and, therefore, is not a proper ground for terminating reunification services and setting a section 366.26 hearing. Although we disagree with Georgeanne's contention that the issue of parental insight may not be considered by the juvenile court, we agree the Los Angeles County Department of Children and Family Services (Department) failed to present sufficient evidence Lucas would be at substantial risk of harm if returned to Georgeanne's home. We grant the petition.

---

[1] Statutory references are to this code unless otherwise stated.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *The Dependency Petitions and Lucas's Removal from Georgeanne*

In December 2017 Georgeanne and Sean H., Lucas's presumed father, pleaded no contest to an amended petition pursuant to section 300, subdivision (b)(1), which alleged Georgeanne and Sean had a history of domestic violence and engaging in altercations in the presence of the child. The petition identified a specific incident when Sean, who had previously been convicted of inflicting corporal injury on a spouse or cohabitant, struck Georgeanne in the face and alleged that the violent altercation endangered Lucas's physical health and safety and placed him at risk of serious physical harm.[2] The petition further alleged Georgeanne had an unresolved history of substance use (marijuana) that rendered her incapable of providing regular care for the child. Lucas was placed with Georgeanne under the supervision of the Department. Family maintenance services for Georgeanne included programming for domestic violence victims, parenting classes, individual counseling and drug testing. The court also ordered that Georgeanne not permit any contact

---

[2]     The plea form signed by Georgeanne, Sean and their attorneys stated Sean, but not Georgeanne, pleaded no contest to the domestic violence count. However, the minute order from the jurisdiction hearing does not indicate the court sustained that count, and the Department's reports similarly omit that count in describing the bases for the court's jurisdiction over Lucas. At the permanency review hearing at issue in this petition, the Department, Georgeanne's counsel and the court all assumed the domestic violence count had been sustained as to Sean.

between Lucas and her current male companion, Arthur A., who had previously been convicted of the forcible rape of his ex-wife.[3]

In May 2018 the court sustained a supplemental petition (§ 387), filed in January 2018, alleging Georgeanne continued to abuse illicit substances including marijuana and had allowed Arthur A. to reside in her home with unlimited access to Lucas in violation of the court's prior order. Lucas was removed from Georgeanne's custody and ordered suitably placed with his paternal grandparents. Family reunification services were ordered, including a full drug/alcohol program with aftercare, domestic violence counseling and parenting classes. Georgeanne appealed. We affirmed the juvenile court's findings and orders. (*In re Lucas H.* (June 11, 2019, B290051) [nonpub. opn.].)[4]

2. *Georgeanne's Efforts at Reunification*

In a November 2018 status review report for the six-month section 366.21, subdivision (e), review hearing, the Department advised the court Georgeanne had tested positive for marijuana at each of nine drug tests she had taken and failed to appear for 13 other tests. Georgeanne, who said her marijuana use was medically necessary but had not provided documentation to support this claim, was discharged from her drug program for

_____

[3]     The December 13, 2017 report stated Georgeanne "is sharing a motel room with her boyfriend Arthur [A.] who was recently convicted on 3/2/17 of PC 262(A)(1) felony:  Rape Spouse by Force/Fear/Etc.  The mother's boyfriend was ordered to complete a domestic violence program and he was placed on 4 years formal supervised probation."

[4]     The sole issue on appeal was whether the Department and the juvenile court had complied with the notice requirements of the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) and related California law.

lack of attendance and for missed and positive drug tests. Georgeanne acknowledged she continued to live with Arthur and confirmed she was pregnant with their child. She tested positive for marijuana throughout her pregnancy.[5]

In a January 16, 2019 last minute information report for the continued six-month review hearing, the Department stated Georgeanne had been minimizing her marijuana use and had begun using alternate pain management resources. Georgeanne requested additional time to begin a substance abuse program after the birth of her son Liam and said she was willing to comply with court orders and to begin all court-ordered programs. At the hearing on January 18, 2019 the court found Georgeanne's progress toward alleviating or mitigating the causes necessitating placement was "minimal" and ordered continuation of her reunification services. The court found Sean's progress was "nonexistent" and terminated his reunification services.

In its initial report for the 12-month review hearing (§ 366.21, subd. (f)) in March 2019, the Department explained that Georgeanne had refused to enroll in any of the programs ordered in her case plan and would not comply with the court order for substance abuse treatment. She continued to test positive for marijuana and insisted she needed to use it to manage the pain associated with gastritis. According to the

---

[5] On January 25, 2019 the Department filed a petition on behalf of Liam, Georgeanne and Arthur's one-month-old son. The court sustained the petition under section 300, subdivision (b)(1), finding true the allegations that Georgeanne had tested positive for marijuana from June 2018 through January 2019 and that Liam had tested positive for marijuana at birth. Liam is the subject of a separate dependency proceeding.

Department, "The mother seems to have a minimal perception to her needs to [c]omply with Court orders to enroll and participate in Substance abuse, Parent education, Individual therapy and Domestic violence.  The mother stated that she has informal support through her boyfriend Arthur [A.] and his family and that she will continue to use marijuana for pain management at this time."  As a result, the Department wrote, she "has minimized the possible safety risks that child Lucas [H.] may endure in her care . . . [and] has failed to gain insight as to how her Substance Abuse affects her child."  The Department recommended terminating Georgeanne's reunification services.

The hearing was continued when Georgeanne asked for a contest.  In an interim review report prior to the continued hearing, the Department advised the court Georgeanne was then enrolled in a substance abuse program and had several negative and several positive tests for marijuana.  She was also participating in a support group for victims of domestic violence.  The Department reported that a concurrent planning assessment had been completed for Lucas and his paternal grandparents, with whom he had been living, who were identified as prospective adoptive parents.  The Department again recommended termination of Georgeanne's reunification services.

After two more continuances the contested 12-month review hearing was held on June 12, 2019.  The court found Georgeanne's progress toward alleviating the causes for Lucas's placement was satisfactory, but not substantial, and ordered reunification services continued for her over the objection of the Department and Lucas's counsel.  The court set a contested permanency review hearing (§ 366.22) for September 17, 2019.

6

### 3. *The 18-month Permanency Review Hearing*

In its report for the 18-month permanency review hearing the Department stated Georgeanne had maintained a strong relationship and bond with Lucas, "and during monitored visitation the mother has provided the child Lucas, age appropriate activities, meals, show[s] affection and continues to be engaging." In addition, Georgeanne had completed all aspects of her case plan, including a domestic violence counseling program.[6] Nonetheless, the Department expressed concern about Georgeanne's lack of insight as to the need for cooperation with the Department's case worker and the importance of the court's no-contact order regarding Arthur in light of Georgeanne's acknowledgement that she and Arthur continued to reside together and have an intimate relationship. Specifically, Georgeanne's case worker wrote, "[T]he mother has failed to demonstrate to this CSW what she has learned in her Parent education classes; [f]urthermore, the mother seems to have a minimal perception to her needs to comply with Court orders when it comes to fully comprehend the inherent dangers associated with family violence, drug abuse, and allowing person(s) with violent criminal backgrounds to have access to her child." The report continued, "The mother's failure to acknowledge, recognize or accept how some of her neglectful and/or abusive behaviors can present a risk and detriment to

---

[6] Although there was a question whether Georgeanne had previously presented evidence of completion of a domestic violence program, at the September 17, 2019 hearing the court admitted as Mother's Exhibit D a certificate of completion of a 12-session, in-person domestic violence class, dated April 28, 2019.

7

child suggests that the mother has been unconvinced of the risks they pose to child. Therefore, it would be detrimental for the child Lucas to be returned to mother at this time." The Department recommended the court terminate reunification services for Georgeanne and set a section 366.26 hearing to determine a permanent plan of adoption for Lucas.[7]

Georgeanne was the only witness at the permanency review hearing. She testified she had not used marijuana since January 2019 and had tested clean 19 times since then. She explained her four no-shows were related to transportation problems. She also completed two parenting classes although the court had ordered only one, as well as domestic violence counseling. Asked what her ideal plan for Lucas was, Georgeanne explained she would like the order prohibiting contact between Lucas and Arthur lifted so that she, Arthur, Lucas, Liam and the second child she was then expecting with Arthur could all live together as a family. Acknowledging she had lived with Arthur for the past two years and was financially dependent on him, Georgeanne nonetheless testified that, if Lucas was released to her and the no-contact order were to remain in effect, she would abide by it and not live together with Arthur. She insisted she had honored the no-contact order since it was issued; Lucas and Arthur had not been together.

With respect to issues of violence, Georgeanne testified Arthur had never struck her or threatened to do so. She also said she had never hit Arthur and insisted claims by Liam's paternal grandparents (Arthur's parents) to the contrary were false.

---

[7] The section 366.26 hearing has been continued to January 7, 2021 because of the COVID-19 pandemic.

Following Georgeanne's testimony Lucas's counsel expressed her agreement with the Department's recommendation to terminate reunification services, explaining, although Georgeanne had completed all court-ordered programs, "She's not gained insight into what led to the court's interfering in this case and jurisdiction.  She still is dependent upon [Arthur] despite no contact orders.  Basically, she's chosen [Arthur] over Lucas in that she continues to rely on him.  Perhaps that's out of necessity.  But she's–I think with the progress she made, if she had more insight she could have reunified with Lucas, but this is a big sticking point for her."

Georgeanne's counsel, after pointing out that everyone who had observed Georgeanne interact with Lucas had described her as extremely appropriate, nurturing and supportive, argued Georgeanne was not choosing Arthur over Lucas.  He insisted Georgeanne was aware of the facts underlying Arthur's rape conviction; she had addressed that situation with him; and, based on her discussions with him, as well as her own peaceful experiences while living with him, believed he is not a danger.  In support of this view, counsel noted that the court in Liam's dependency proceeding had ordered reunification services for Arthur, indicating its belief he was capable of developing into a positive father figure for his son.  Counsel asked the court to return Lucas to Georgeanne's home and either lift the no-contact order concerning Arthur or, at least, permit Arthur to have monitored visitation with Lucas.

The Department reiterated the position in its report for the hearing:  Georgeanne had not actually internalized anything.  As its counsel explained, "She has admitted that she has decided to continue with [Arthur].  She's having another child with him.

9

She's not independent, she's co-dependent on him. She knows what his conviction is. It's not relevant that the court didn't sustain that petition. It is the truth, and mother admits that. Yet, she sees no problem. She's in conjoint counseling with him. She's trying to make a family with him when one of the counts that was sustained on Lucas's case was domestic violence with the father of Lucas. So she has chosen another individual who has those tendencies. I don't believe that she can keep [Arthur] away from Lucas."

The court terminated family reunification services for Georgeanne and set the section 366.26 hearing to consider termination of parental rights with adoption as Lucas's permanent plan, finding that Georgeanne was in satisfactory compliance with her case plan,[8] but not in full compliance because "she has not gained meaningful insight. . . . [P]articipation in programs alone is not enough. Insight is what the court looks towards." Explaining its decision, the court expressed its belief, based the Department's reports and Georgeanne's testimony, that the moment Lucas was released to Georgeanne, he would have contact with Arthur notwithstanding the no-contact order. Continuing, the court said, "I do not believe that the mother has shown the level of insight to extricate herself from him or to see that he is addressing the issues that led to that conviction over in that court so that that does not happen again or it does show that he is a safe individual for a child to be around."

---

[8] The court found that Georgeanne had resolved her substance use/marijuana issue.

**DISCUSSION**

    1. *Governing Law and Standard of Review*

    The Legislature has determined the juvenile court may generally offer family reunification services for a maximum period of 18 months. (§§ 361.5, subd. (a)(3), 366.22, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249.)[9] At the 18-month permanency review hearing the juvenile court must order a child returned to a parent's custody unless it finds, by a preponderance of the evidence, that return of the child will create a substantial risk of detriment to the child's safety, protection or physical or emotional well-being. (§ 366.22, subd. (a).) "That standard is construed as a fairly high one. [Citation.] It does not mean the parent in question is less than ideal, did not benefit from reunification services as much as we might have hoped, or seemed less capable than the available foster parent or other

---

[9]     Sections 361.5, subdivision (a)(4)(A) and 366.22, subdivision (b), authorize the juvenile court to extend reunification services beyond the 18-month statutory period in certain limited circumstances, none of which is present in this case. There are also cases in which appellate courts have ruled reunification services may continue beyond the 18-month statutory period, but those cases involved truly exceptional situations in which some external factor thwarted the parent's efforts at reunification. (See, e.g., *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1787, 1796 [mother was hospitalized during most of the reunification period; after her release the child welfare agency attempted to restrict visitation]; *In re Daniel G.* (1994) 25 Cal.App.4th 1205, 1209, 1212-1214 [the Department's reunification services for the father were a "disgrace"]; *In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777-1778 [no reunification plan was ever developed by the child welfare agency for the father].)

11

family member." (*M.G. v. Superior Court* (2020) 46 Cal.App.5th 646, 660 (*M.G.*).)

If the child is not returned to a parent at the permanency review hearing, the court must terminate reunification services and order a hearing pursuant to section 366.26. (§ 366.22, subd. (a).) However, the court has discretion to enter a home-of-parent order while continuing court supervision and services. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 311-312 ["[w]e do not believe this 18-month limit on family reunification services constrains the juvenile court's authority to order family maintenance services beyond that time for a child who has been returned to the custody of his or her parent"]; see § 16506.)

We review the juvenile court's finding of detriment for substantial evidence. (*In re B.S.* (2012) 209 Cal.App.4th 246, 252; *Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763.) Under that standard we inquire whether the evidence, contradicted or uncontradicted, supports the court's determination. We resolve all conflicts in support of the determination, indulge in all legitimate inferences to uphold the findings and may not substitute our deductions for those of the juvenile court. (*In re I.J.* (2013) 56 Cal.4th 766, 773; *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 966; see *In re Quentin H.* (2014) 230 Cal.App.4th 608, 613.) However, "[s]ubstantial evidence is not synonymous with any evidence. [Citation.] To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value." (*In re M.S.* (2019) 41 Cal.App.5th 568, 580; accord, *In re J.A.* (2020) 47 Cal.App.5th 1036, 1046 [while substantial evidence may consist of inferences, any inferences must rest on the

12

evidence; inferences based on speculation or conjecture cannot support a finding].)

2. *A Parent's Lack of Insight May Be Considered by the Juvenile Court When Assessing Whether a Child May Safely Be Returned Home*

Emphasizing the juvenile court recognized that Georgeanne had resolved her marijuana problem by the time of the section 366.22 hearing and had satisfactorily completed her court-ordered programs and services, in her briefing Georgeanne contends lack of insight is not a valid ground for finding Lucas's return to her home would create a substantial risk of detriment to his safety or physical or emotional well-being:  "We judge people on what they *do*, not what they *think*."[10]

In support Georgeanne relies primarily on *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738 (*Blanca P.*), in which the court of appeal criticized the juvenile court's reliance on the social worker's view that the parents had not sufficiently internalized proper parenting skills to support a finding of detriment if the children were returned to them.  Georgeanne quotes a portion of the court's vivid language, "The idea that, despite enduring countless hours of therapy and counseling (much of it predicated on the possibly erroneous assumption that her husband is a child molester), a parent who has faithfully attended required counseling and therapy sessions must still

---

[10]     When questioned at oral argument, Georgeanne's appellate counsel appeared to retreat from the absolutist position that a parent's lack of insight into the problem creating the need for dependency jurisdiction could never be a valid factor when evaluating the safety of returning the dependent child to the parent's care.

13

relinquish her child because she has not quite 'internalized' what she has been exposed to has an offensive, Orwellian odor. The failure to 'internalize' general parenting skills is simply too vague to constitute substantial, credible evidence of detriment. To hold otherwise would come perilously close to allowing legal decisions of monumental importance to the persons involved to be based on nebulous ideas more appropriate to an afternoon talk show than a court of law." (*Id.* at p. 1751, fn. omitted.)[11]

Georgeanne also directs us to *In re Jasmine G.* (2000) 82 Cal.App.4th 282 (*Jasmine G.*) and *M.G.*, *supra*, 46 Cal.App.5th 646. In *Jasmine G.*, a case in which dependency jurisdiction was predicated on the parents' use of inappropriate forms of corporal punishment, the court held the social worker's opinion that the parents "apparently lacked a 'full understanding' of their 15-year-old daughter's adolescent 'issues'" did not support the disposition order removing the child from the parents' custody. (*Jasmine G.*, at pp. 284-285 ["Excuse us—but what parent *doesn't* that describe?"].)

---

[11] The mother in *Blanca P.* was ambivalent about believing the father had sexually molested their daughter; the father never acknowledged he had done so. The principal ground for issuing the extraordinary writ and ordering a new permanency review hearing was the insufficiency of the evidence that any sexual abuse had occurred. (See *Blanca P.*, *supra*, 45 Cal.App.4th at p. 1760 ["If, at the new 18-month hearing, the juvenile court finds that Rogelio did not commit child molestation, then (assuming there are no new developments that would warrant otherwise) the children should be returned to their parents; that is the logic of our decision that there is no support for a detriment finding apart from the molestation allegations"].)

14

The *Jasmine G.* court explained, "The case before us is remarkable for the clear and convincing evidence that it *was* safe to return Jasmine to either of her parent's homes. Both parents had forsworn corporal punishment of teenagers. Both expressed remorse for having used corporal punishment on Jasmine. Both had attended parenting classes, and both had undergone therapy to improve their parenting skills. Jasmine had no fear of either. One therapist opined it was totally safe to return the child and the other simply had 'no recommendation' (in a context where it was not at all clear that her 'hesitancy' went to Jasmine's physical safety, as distinct from what was merely optimum). Jasmine herself wanted to go home." (*Jasmine G.*, *supra*, 82 Cal.App.4th at pp. 288-289.) Against this background, the court held, the social worker's subjective belief that Jasmine's admittedly strict parents lacked an adequate understanding of their roles in the incident that triggered the dependency court's intervention and had not sufficiently internalized parenting skills did not constitute clear and convincing evidence of substantial danger as required by section 361 before a child may be removed from the custody of his or her parent. (*Jasmine G.*, at p. 289.)

In *M.G.*, *supra*, 46 Cal.App.5th 646, a different panel of the same division that had decided both *Blanca P.* and *Jasmine G.* considered a juvenile court's findings of detriment based on its concerns the mother's relationship with her former boyfriend, P.B., was a threat to her sobriety, and the father's lack of insight concerning his responsibility for the events that led to dependency jurisdiction. (*M.G.*, at pp. 658-659.) The *M.G.* court found those findings were not supported by substantial evidence: "SSA [the child welfare agency] failed to articulate specific reasons why or how the children would be at risk if placed in

15

Mother's or Father's care. The juvenile court's ruling relied on SSA's vague and nebulous concerns that were not supported by evidence. The court stated it had no concerns with the parents' substance abuse. It focused on Mother's relationship with P.B., even though Mother testified she was merely friends with P.B., and her therapist testified she had no concerns about Mother's relationship with P.B. SSA produced no evidence contradicting that evidence. In short, the court based its concerns on a hunch that was not supported by any evidence, stating Mother's relationship with P.B. was 'a risk to you and your sobriety.' Furthermore, this contradicted the court's determination Mother's sobriety was no longer an issue. [¶] The juvenile court stated Father had 'an issue with respect to insight,' but did not state what evidence supported this characterization." (*Id*. at pp. 661-662.)

None of these cases holds a parent's lack of insight may not be considered by the juvenile court at the section 366.22 permanency review hearing. Rather, as the court explained in *Blanca P.* after reviewing earlier authority on the point, before the qualitative evaluation as to the effectiveness of counseling, therapy or parenting classes can constitute sufficient evidence to support a finding of detriment, the psychologist's or social worker's opinion must be "based on *evidence* rather than an emotional response. To paraphrase Gertrude Stein's famous dictum, there must be something there there." (*Blanca P., supra*, 45 Cal.App.4th at p. 1750.)

It was on exactly this basis that our colleagues in Division Five of this court, in *Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, distinguished *Blanca P.* as involving "conclusory reports which find no corroboration in the conduct of

16

the parent" (*Constance K.*, at p. 693), and held at a section 366.22 hearing, even if the parent has fully complied with the reunification plan, the court may consider "properly supported psychological evaluations which indicate return to a parent would be detrimental to a minor." (*Constance K.*, at p. 705.) Similarly, in *In re Dustin R.* (1997) 54 Cal.App.4th 1131, the court of appeal held compliance with the reunification plan need not be the sole concern of the juvenile court. (*Id.* at p. 1139.) "[S]imply complying with the reunification plan by attending the required therapy sessions and visiting the children is to be considered by the court; but it is not determinative. The court must also consider the parents' progress and their capacity to meet the objectives of the plan; otherwise the reasons for removing the children out-of-home will not have been ameliorated." (*Id.* at p. 1143; see *In re Jacob P.* (2007) 157 Cal.App.4th 819, 830 [although "usually the case, a parent's compliance with the case plan is not a guarantee the child will be returned to the parent"].) Indeed, section 366.22, subdivision (a), expressly requires the juvenile court, in assessing whether returning the child to his or her parent would create a substantial risk of detriment, to consider all admissible, relevant evidence. (See generally *In re Shaputis* (2011) 53 Cal.4th 192, 219 [inmate's current attitude toward past criminal conduct may be a significant predictor of future behavior should parole be granted].)

Moreover, as a victim of domestic violence, Georgeanne's insight into the risks potentially created for Lucas by her relationship with Arthur, a man who had committed felony spousal rape, is a far cry from the perceived failure to internalize general parenting skills or to understand teenage angst as

17

considered in *Blanca P.* and *Jasmine G.* It is similar, as Georgeanne points out, to the social worker's concern in *M.G.* for the threat posed to the mother's sobriety by her friendship with an ex-boyfriend. But, as discussed, the court in *M.G.* issued the extraordinary writ because the juvenile court had found the mother's sobriety was no longer an issue and the social worker's concern was not only unsupported by any evidence but also contradicted by the testimony of the mother's therapist, not because consideration of the mother's recognition of potential dangers to her continuing sobriety was improper. (*M.G.*, *supra*, 46 Cal.App.5th at pp. 661-662.)

3. *The Department Failed To Present Substantial Evidence Lucas Would Be at a Substantial Risk of Detriment If Returned to Georgeanne*

Properly framed, the issue before us is not whether the juvenile court erred by considering the extent of Georgeanne's insight into the problem that led to Lucas's removal from her custody at the section 387 hearing, but the weight the juvenile court could properly give the Department's opinion that her lack of insight created a substantial risk of harm to Lucas if he were returned to her custody—that is, did substantial evidence support the court's finding of detriment. It did not. The Department's and the court's assessment Lucas risked exposure to family violence, even with a no-contact order or monitored visitation for Arthur, depended on two inferences: Georgeanne would violate the court order, and Arthur would commit (or was likely to commit) an act of violence against Georgeanne or perhaps Lucas. Neither essential inference had a basis in the evidence.

18

Certainly, Arthur committed a serious act of violence against his ex-wife, for which he was convicted of a felony and placed on probation. But there was no evidence he engaged in any physical or verbal abuse toward Georgeanne during the 22 months they had been living together. Nor was there reason to believe, if violence were threatened, Georgeanne would be a passive victim and unable to protect Lucas. To the contrary, although she had not reported previous incidents of domestic abuse, in September 2017 Georgeanne notified law enforcement that Sean had hit her and threatened her life and obtained a restraining order protecting both her and her child.[12] In addition, Georgeanne has now successfully completed the program for victims of domestic violence ordered by the court.

While the Department and the juvenile court are justifiably aware that patterns of domestic violence are often repeated in new relationships, a finding of risk of harm to a child must be based on more than conjecture or a theoretical concern. (See *M.G.*, *supra*, 46 Cal.App.5th at p. 663 ["We are puzzled and dismayed by the juvenile court's willingness to accept Ford's testimony based on a theoretical and speculative future cycle of violence involving Mother. Simply put, there was no evidence, much less substantial, of any risk or detriment to the children"].) Here, other than Arthur's single past (serious) criminal act with a

---

[12] As noted, it is unclear whether the juvenile court sustained the domestic violence count against Sean. In any event, neither the original nor the amended version of that count alleged Lucas was placed at risk because Georgeanne was unable to protect him from exposure to Sean's violence.

19

different victim, there is no evidence he posed a risk of violence toward Georgeanne or Lucas.[13]

Whatever theoretical risk Arthur might pose, moreover, could be effectively neutralized by continuing court supervision and services while returning Lucas to Georgeanne's care. The Department's concern, adopted by the court, that Georgeanne would violate a no-contact order was speculative. To be sure, Georgeanne testified she believed Arthur could be a good father to Lucas and hoped she, Arthur, Lucas, Liam and the child she was then expecting could all live together as a family—a goal reflected to a large extent by the court's case plan in Liam's dependency proceeding. But Georgeanne acknowledged her violation of the no-contact order in January 2018 was, in substantial part, the basis for the Department's section 387 petition and the reason Lucas was removed from her custody. She testified she would abide by any future order for monitored

---

[13] In an addendum report for the June 12, 2019 disposition hearing for Lucas's half-sibling Liam (Arthur and Georgeanne's son), the Department advised the court that, according to Liam's paternal grandmother, Arthur had described an incident during which Georgeanne "had 'pounded' on his head while he drove because he had suggested that the mother do some things which made the mother angry." The report also attached a February 2019 text message from Arthur to Liam's paternal aunt in which he described the same event. Although Georgeanne testified the account was false, the juvenile court referred to it and observed, "So they [Arthur and Georgeanne] still have a strange relationship that needs to be addressed and dealt with, which is why I think they're in the couples counseling." The court, however, did not rely on this episode in determining there was a substantial risk of harm to Lucas if returned to Georgeanne's home.

visitation between Lucas and Arthur, or a no-contact order if one remained in place, even though she did not believe it was necessary.  Although Georgeanne appeared to be financially dependent on Arthur, the father of two of her children, nothing in the record suggested that his support would end if the no-contact order continued or that she had not benefitted sufficiently from her parenting classes and individual counseling to understand the importance of complying with a court order restricting Arthur's interaction with Lucas.

Through the section 366.22 permanency review hearing, family preservation remains the priority in dependency proceedings.  (*In re Taylor J.* (2014) 223 Cal.App.4th 1446, 1451 ["[f]amily preservation is the first priority in dependency proceedings unless parental rights are terminated"]; see *M.G.*, *supra*, 46 Cal.App.5th at p. 659; *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789.)  While Georgeanne may not be an ideal parent, the Department failed to carry its burden to establish that returning Lucas to her home, with appropriate safeguards in place, would create a substantial risk of detriment to his safety or well-being.  Accordingly, section 366.22, subdivision (a), required the court to return the child to Georgeanne's physical custody.

## DISPOSITION

The petition for extraordinary writ is granted.  Let a peremptory writ of mandate issue directing the juvenile court to (1) vacate its order setting a hearing for Lucas under section 366.26, and (2) set a continued 18-month permanency review hearing at the earliest date consistent with the rights of the parties to prepare their case.  At the new hearing, in addition to the evidence previously presented, the

21

court is to consider all further evidence concerning developments subsequent to September 17, 2019, including information from Liam's dependency case, relevant to the question of Lucas's safe return to Georgeanne.  In the interest of justice, this decision shall become final as to this court five days from the date it is filed.  (Cal. Rules of Court, rule 8.490(b)(2)(A).)


                                    PERLUSS, P. J.


    We concur:


        SEGAL, J.


        FEUER, J.